1

**GUCOVSCHI LAW FIRM, PLLC.**
Adrian Gucovschi (State Bar No. 360988)

2

140 Broadway, Fl. 46
New York, NY 10005

3

Telephone: (212) 884-4230
Facsimile: (212) 884-4230

4

E-Mail: adrian@gucovschilaw.com

5

6

*Attorneys for Plaintiff*

7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA**

9

10

REBECCA GOMEZ, individually and on behalf
of all others similarly situated,

11

12

                                                      Plaintiff,

13

           v.

14

15

DREYER'S GRAND ICE CREAM, INC.,

16

                                                      Defendant.

17

Case No.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    Plaintiff Rebecca Gomez ("Plaintiff") brings this action on behalf of herself and all others

2    similarly situated against Dreyer's Grand Ice Cream, Inc. ("Defendant").  Plaintiff makes the

3    following allegations pursuant to the investigation of her counsel and based upon information and

4    belief, except as to the allegations specifically pertaining to herself, which are based on her

5    personal knowledge.

6    <u>**NATURE OF THE ACTION**</u>

7    1.    Plaintiff brings this class action on behalf of herself and all similarly situated

8    consumers who purchased Outshine frozen fruit bars (collectively, the "Products").[1]

9    2.    Defendant markets the Products as "Fruit Bars" that are "Made with Real Fruit" and

10    "Plant Based" which "tastes like biting into a piece of ripe fruit" making it the "snack that

11    refreshed you from the inside out." In addition, Defendant states that the Products are a "good

12    source of vitamin c," "Fat free" and containing "No high fructose corn syrup" and "No artificial

13    colors or flavors" (collectively, the "Representations"). Defendant reinforces the representations

14    with lush images of fruits and plant leaves.



---

[1] The Products are comprised of the following flavors: Strawberry; Lime; Grape; Mango; Watermelon; Peach; Tangerine; Pomegranate; Cherry; Lemon; Pineapple; and assorted variety packs (such as Strawberry/Lime/Raspberry, Cherry/Tangerine/Grape, Pineapple/Watermelon/Mango, and Lime/Tangerine/Lemon).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED    1

3. Defendant's branding leads reasonable consumers to believe that the Products are ((1) healthy; (2) comprised exclusively, or at least predominately, of the depicted fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without artificial flavors.



4. Despite those representations, however, the Products are (1) unhealthy due to the high amount of added sugar; (2) comprised of ingredients not found in real fruit; (3) nutritionally distinct from real fruits; (4) contain synthetic ingredients; and (5) contain artificial flavors.

5. As depicted above, the Products contain substantial amounts of added cane sugar and water, yielding roughly twice the sugar of an equivalent serving of real fruit. Specifically, the Products contain 28 grams of sugar per serving, of which 24 grams are added sugar, equaling 44% of the daily value limit. Based on this, Defendant's use of "Fruit Bars" is a misnomer: the Products are more accurately described as cane sugar with water on a stick. Second, Defendant's Products are flavored with lemon juice, although that fruit is entirely missing from the front label. Third, Defendant's Products contain synthetic and artificial flavoring agents, including ascorbic acid, citric acid, and malic acid, which are added to simulate or reinforce the tart fruit flavors of the bars.

1    In each event, the inclusion of these synthetic ingredients renders Defendant's "No artificial

2    flavors" false and misleading.

3        6.    Accordingly, Plaintiff brings claims against Defendant for violations of (1)

4    California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) California's

5    Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (3) Violation of California's

6    False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; and (4) Breach of Express

7    Warranty.

8                                **PARTIES**

9        7.    Plaintiff Rebecca Gomez is a citizen of California residing in Arcata, California.

10   Plaintiff purchased Defendant's "strawberry" Products for her personal use multiple times during

11   the applicable statute of limitations, with her last purchase of those flavors taking place from a

12   local Safeway in Arcata, California, on or about September 2025.  Prior to making her purchase,

13   Plaintiff saw and relied on Defendant's Representations on the front and side panels of the

14   Products' packaging. Based on the Representations, Plaintiff was led to believe that the Products

15   were comprised exclusively of strawberry and that, like strawberries, the Products were healthy

16   and did not contain "artificial colors or flavors" or "high fructose corn syrup." In short, Plaintiff

17   believed that she was buying a "Fruit Bar." Plaintiff saw these Representations and warranties prior

18   to, and at the time of, her purchase. Thus, Plaintiff reasonably relied on Defendant's

19   Representations when he decided to purchase the Products.  Accordingly, these Representations

20   and warranties were part of the basis of her bargain, in that Plaintiff would not have purchased the

21   Products on the same terms had he known that these Representations and warranties were untrue.

22   Furthermore, in making her purchases, Plaintiff paid a price premium due to Defendant's false and

23   misleading claims regarding the Product's Representations. Plaintiff, however, did not receive the

24   benefit of the bargain because the Products were not, in fact, healthy, nutritionally equivalent to a

25   fruit bar, and free of artificial flavors and multiple synthetic ingredients.  Had Plaintiff known that

26   Defendant's Representations and warranties about the Products were false and misleading, Plaintiff

27   would not have purchased the Products or would have paid substantially less for them.

28

8.      Defendant Dreyer's Grand Ice Cream, Inc. is a Delaware Corporation with its principal place of business in Walnut Creek, California. Defendant manufactures, markets, and sells the Products throughout California and the United States.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000.00 exclusive of interest and costs, and Plaintiff, as well as most members of the proposed Classes, are citizens of states different from Defendant.

10.     This Court has personal jurisdiction over Defendant and venue is proper because Defendant is headquartered in this District. Furthermore, Defendant conducts and transacts business in the State of California, including this District, thereby purposefully availing itself to the benefits of the forum, and a substantial portion of the events giving rise to Plaintiff's claims occurred in this District, including Plaintiff's purchasing the Products in this District.

## FACTUAL ALLEGATIONS

**A.      Consumers' Demand for Healthy Fruit-Based Snacks**

11.     "Clean label claims resonate for purchasers of … juices and include natural, no artificial flavors, and no artificial colors."[2]  In fact, at least one survey found that "Americans are paying more attention to ingredient lists, choosing clean ingredients and avoiding chemical sounding ingredients" while "[a]bout half of Americans say they seek out natural flavors at least some of the time [and] artificial flavors, colors, sweeteners and preservatives were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time."[3]  In fact, a 2023 study of consumer perceptions and preferences found that

---

[2] Innova Market Insights, *Food Trends: US Consumer Preferences* (May 14, 2024) *available* https://www.innovamarketinsights.com/trends/food-trends/ (last accessed July 10, 2024).

[3] Food Insight, *IFIC Survey: From "Chemical-sounding" to "Clean": Consumer Perspectives on Food Ingredients* (June 17, 2021) *available* https://foodinsight.org/ific-survey-from-chemical-sounding-to-clean-consumer-perspectives-on-food-ingredients/ (last accessed July 10, 2024).

products "Labeled as Having No Artificial Ingredients/Colors" were the second-highest scoring indicator of food safety according to respondents.[4]

12.     "The global frozen fruit bar market was valued at approximately $4.1 billion in 2023 and is projected to expand at a compound annual growth rate (CAGR) of 5.6% through 2032."[5] This robust expansion is directly attributable to a "rising consumer demand for healthy and convenient snack options, alongside increasing awareness about the health benefits of fruit-based products."[6] The frozen fruit bar market's growth has been particularly pronounced among "millennials and Generation Z, who are increasingly drawn to products positioned as "handy, refreshing, and guilt-free snacking options."[7] As much as 55% of millennials and Gen Z include frozen fruit bars in their snack routines, with lifestyle preferences for "portable, refreshing, and health-forward options" significantly boosting demand.[8]

13.     Defendant has capitalized on consumers' desire for healthy fruit-based snacks. In its efforts to monopolize the fruit-based snacks market, Defendant has chosen to "greenwash" the Products by claiming that they are:

- "Fruit Bars"
- "Made with Real Fruit"
- "Plant Based"
- "Every bite of an Outshine® Fruit Bar tastes like biting into a piece of ripe fruit"
- "Made with real fruit, it's the snack that refreshes you from the inside out"
- "Refreshingly Real"

---

[4] International Food Information Counsel, *2023 Food and Health Survey*, (May 23, 2023) *available* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://foodinsight.org/wp-content/uploads/2023/05/IFIC-2023-Food-Health-Report.pdf at 73 (last accessed July 10, 2024).

[5] Dataintelo, *Frozen Fur Bar Market*, https://dataintelo.com/report/frozen-fruit-bar-market (last accessed December 9, 2025).

[6] *Id.*

[7] Verified Market Research, *Frozen Fruit Bar Market Size, Share & Forecast* (Sept. 4, 2025), https://www.verifiedmarketresearch.com/product/frozen-fruit-bar-market/. (last accessed December 9, 2025).

[8] Reanin, *Frozen Fuit Bars Market* (Nov., 2025), https://www.reanin.com/reports/frozen-fruit-bars-market (last accessed December 9, 2025).

- "Labels with ingredients you can pronounce"
- "Our fruit bars are powered by plants, so you can get your feel-good snacking on"
- "Good Source of Vitamin C"
- "No high fructose corn syrup"
- "No artificial colors or flavors"
- "Fat free"
- "Gluten free"
- "No GMO ingredients"

14.      In addition to the Representations on the packaging of the Products, Defendant's extensive marketing throughout major e-commerce retailers, including Walmart, Target, Kroger Walgreens makes the following claims:

> "Each Outshine frozen fruit bar is made with no GMO ingredients and has no artificial colors, flavors, sweeteners or high fructose corn syrup for a feel-good snack. Enjoy these wholesome fat free Outshine bars any time of day, whether you want a feel-good strawberry snack or need a little afternoon pick-me-up."

15.      As described in greater depth below, Defendant's Representations are designed to create a healthy aura while masking the fact that the Products contain highly processed and synthetic ingredients, along with the detrimental health effects of consuming the amount of sugar contained therein. In short, the Products are far from the "feel good snacking" promised by Defendant.

**B.      The Products' Contain Synthetic Ingredients**

      i.      _Citric Acid_

16.      Citric acid "is one of the most common additives in food and beverage products across the world."[9]  Although citric acid is naturally occurring, in 2021, commercial, global

---

[9] Env't Protection Agency, _Citric Acid Supply Chain – Executive Summary_, available chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.epa.gov/system/files/documents/2023-03/Citric%20Acid%20Supply%20Chain%20Profile.pdf (last accessed July 11, 2024).

production of the additive was estimated to be about 736,000 tons per year.[10]  As explained by drink brand Drink Sound, "[a] vast majority of the citric acid that [consumers] see in packaged foods … is not from citrus fruit but instead manufactured in bulk."[11]  Accordingly, "it is not the naturally occurring citric acid, but the *manufactured* citric acid [] that is used extensively as a food and beverage additive."[12]  In fact, "over 90% of the world's citric acid production is manufactured using three methods: Submerged fermentation (SF), liquid surface fermentation (LSF), and solid-state fermentation (SSF)."[13]

17.    The Food and Drug Administration ("FDA") explains that the "Solvent extraction process for citric acid" is accomplished via "recovery of citric acid from conventional Aspergillus niger fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of a mixture of n- octyl alcohol meeting the requirements of § 172.864 of this chapter, *synthetic* isoparaffinic petroleum hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecyl amine. 12 C.F.R. § 173.280 (emphasis added). Chemical solvents such as n-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons are used to extract the citric acid that Defendant uses in the Products from *aspergillus niger* fermentation liquor. *See* 21 C.F.R § 173.280. Accordingly, the U.S. Food and Drug Administration ("U.S. F.D.A.") considers citric acid as a food additive.[14] Citric acid is commonly used as a flavor enhancer to impart tartness due to its acidic profile.[15]

---

[10] Bikash Chandra Behera, et al., *Microbial Citric Acid: Production, Properties, Application, and Future Perspectives*, (Feb. 1, 2021) *available* https://onlinelibrary.wiley.com/doi/10.1002/fft2.66 (last accessed July 11, 2024).

[11] Drink Sound, *Citric Acid: Why Is It In Everything?* available https://drinksound.com/blogs/sip-on/citric-acid-why-is-it-in-everything (last accessed July 11, 2024).

[12] Illiana E. Sweis & Bryan C. Cressey, *Potential Role of the Common Food Additive Manufactured Citric Acid in Eliciting Significant Inflammatory Reactions Contributing to Serious Disease States: A Series of Four Case Reports*, 5 Toxicology Rep. (2018)  808-812, *available* doi: 10.1016/j.toxrep.2018.08.002 (last accessed July 11, 2024).

[13] Ewelina Ksiazek et al, *Citric Acid: Properties, Microbial Production, and Applications in Industries*, 29(1) Molecules (Jan. 2024) *available* doi: 10.3390/molecules29010022 (last accessed July 11, 2024).

[14] U.S. Food & Drug Admin., *Food Additive Status List*, (last accessed November 26, 2025), *available* https://www.fda.gov/food/food-additives-petitions/food-additive-status-list.

[15] *See e.g.*, Ize ("SPARKLING WATER, APPLE JUICE CONCENTRATE, WHITE GRAPE JUICE CONCENTRATE, CLARIFIED PEACH JUICE CONCENTRATE, NATURAL FLAVOR,

---

ii.     *Malic Acid*

18.     Malic acid produced for industrial uses, such as the malic acid that is "widely used in the food industry … is generally obtained through chemical synthesis."[16] Malic acid produced for use as a food additive is called DL-Malic Acid. DL-Malic Acid is commercially produced in a few ways, including by the hydration of fumaric acid or maleic acid[17] and by "the catalytic oxidation of benzene to maleic acid, which is converted to Malic Acid by heating steam under pressure.[18] Malic acid is considered a food additive and is listed on the FDA Food Additive Status List.[19] Additionally, malic acid is used as a flavor enhancer, flavoring agent, and adjuvant. 21 C.F.R § 184.1069.

iii.     *Ascorbic Acid*

19.     "Ascorbic acid is a human-made isolate used in myriad processed supplements that was created to cost-effectively mimic and replace naturally occurring vitamin C found in natural food.  It's often derived from GMO corn starch, GMO corn sugar or rice starch."[20]  For that reason,

---

CITRIC ACID, GUM ARABIC, BETA CAROTENE (COLOR), RED RADISH JUICE CONCENTRATE (COLOR). ***CITRIC ACID IS ADDED FOR TASTE/TARTNESS AND IS NOT ADDED FOR PURPOSES OF PRESERVING THE BEVERAGE***.") (emphasis added), https://www.amazon.com/IZE-Blackberry-Sparkling-Juice-Cans/dp/B0DZ6NM3VZ (last accessed September 3, 2025).

[16] POLYNT GROUP, Malic Acid for Food , available at: https://www.polynt.com/malic-acid-in-food/ (last visited August 20, 2022); James Han, What is Malic Acid in Food? Benefits, Uses, Safety, Side Effects, (Jan. 19, 2020) foodadditives.net, available at: https://foodadditives.net/acidulents/malic-acid/ ("Malic acid sold in the market usually refers to its DL form …. [DL Malic Acid] does not occur naturally and according to the FDA, it can be commercially produced by hydration of fumaric acid or maleic ac*Id.*") (last visited August 24, 2022).

[17] *Id.*

[18] Monice Zondlo Fiume, et. al., Final Report on the Safety Assessment of Malic Acid and Sodium Malate, 20 Int'l J. of Toxicology, 47, 48 (June 15, 2000), available at: https://pubmed.ncbi.nlm.nih.gov/11358110/ (last visited August 24, 2022).

[19] Substances Added to Food (formerly EAFUS), U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/food/food-additives-petitions/food-additive-status-list#ftnA (last visited May 8, 2025).

[20] Smidge Blog, *Why Real Food Vitamin C is better Than Ascorbic Acid – And How To Tell The Difference*, (June 1, 2021), *available* https://www.getsmidge.com/blogs/news/vitamin-c-versus-ascorbic-acid (last accessed November 26, 2025).

---

ascorbic acid is referred to as "synthetic vitamin C."[21]  Although ascorbic acid can be naturally occurring and mimics vitamin C's chemical structure, its "reactive nature makes isolation of the substance from natural sources challenging, which has resulted in all commercial ascorbic acid being synthetically produced."[22]  The FDA lists ascorbic acid as a chemical preservative. 21 C.F.R. § 182.3013; 21 C.F.R 170.3(e)(1).

20.    In fact, just like Defendant's misbranded Products here, in 2015, the FDA informed fruit product producer Chiquita Bananas that its Pineapple Bites and Pineapple Bites with Coconut products were "misbranding with the meaning of section 403(k) of [21 U.S.C. 343(k)] in that they contain the chemical preservatives ascorbic acid and citric acid but their labels fail[ed] to declare these preservatives with a description of their functions."[23]

21.    Importantly, ascorbic acid functions as a flavor enhancer in the Products. The FDA specifically recognizes ascorbic acid function as a "flavor enhancer, flavoring agent or adjuvant."[24] It is also well established that ascorbic acid provides a "clear, strong, constant sour taste… described as tingling, sharp, acidic and fruity."[25] Indeed "while best known for its role in nutrition, ascorbic acid also contributes to the sourness of foods like oranges and strawberries."[26]

---

[21] Mount Sinai, *Vitamin C (Ascorbic Acid)*, available https://www.mountsinai.org/health-library/supplement/vitamin-c-ascorbic-acid (last accessed November 26, 2025).

[22] National Organic Program, *Ascorbic Acid – Technical Evaluation Report*, U.S. Dep't of Agriculture (July 17, 2019) *available* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ams.usda.gov/sites/default/files/media/AscorbicAcidTRFinal7172019.pdf (last accessed November 26, 2025).

[23] David Bellm, *Food Packaging: FDA Says Chiquita Labels Are Misleading*, Packing Digest (Mar. 11, 2015) *available* https://www.packagingdigest.com/trends-issues/food-packaging-fda-says-chiquita-labels-are-misleading (last accessed November 26, 2025).

[24] https://hfpappexternal.fda.gov/scripts/fdcc/index.cfm?set=FoodSubstances&id=ASCORBICACID (last accessed November 26, 2025).

[25] Schiffman, S. S., and C. Dackis, *Taste of Nutrients: Amino Acids, Vitamins, and Fatty Acids.* Perception & Psychophysics, vol. 17, no. 2, 1975, pp. 140–146, https://doi.org/10.3758/BF03203878

[26] Tuzim, Kamila, *Sour Grapes and Beyond: The Chemistry of Sour Taste Compounds."* Afr. J. Food Sci. Technol. 2023; Vol,No.DOI: http://dx.doi.org/10.14303/ajfst.2023.045

, www.interesjournals.org/articles/sour-grapes-and-beyond-the-chemistry-of-sour-taste-compounds-101969.html

---

Defendant's ingredient lists in the Products corroborate this – ascorbic acid is placed directly above "natural flavors" in order of predominance for most of the Products.

*iv.*    <u>Guar Gum</u>

22.    Guar gum is a synthetically processed food additive derived from the seeds of the guar plant (*Cyamopsis tetragonolobus*). For food-grade guar gum production, the manufacturing process involves synthetic chemical treatments. To produce clarified guar gum—which yields clear, colorless solutions required for food applications—"[t]he clarified gum is obtained by dissolution in hot water and then recovery by precipitation in ethanol or isopropanol solutions."[27] Notably, ethanol and isopropanol are synthetic organic solvents used to chemically separate and purify the gum from plant material.

23.    Moreover, guar gum frequently undergoes further chemical modification using synthetic reagents to enhance its functional properties for food use. Common chemical modifications use organic solvents such as "methanol, ethanol, isopropanol, n-propyl alcohol, n-butyl alcohol" and other commonly used purification solvents such as "acetone."[28] One patent describes that propylene oxide "may be added in amounts ranging from about 0 to about 100 parts per 100 parts of gum splits."[29] These chemical modification processes transform the naturally-occurring guar endosperm into a synthetically-altered food additive with properties not found in nature.

24.    Importantly, guar gum has been associated with adverse digestive and immune effects in both human and animal studies. A 2022 study found that "food additive guar gum adversely impacts the gut microbiota activity and colonic immune response and increases susceptibility to colonic inflammation."[30] The study concluded that experimental mice maintained on a guar gum-

---

[27] FAO, *Guar gum*, available at https://www.fao.org/fileadmin/templates/agns/pdf/jecfa/cta/69/Guar_gum.pdf (last accessed December 9, 2025).

[28] U.S. Patent No. 5,489,674, *Guar gum composition and process for making it* (Feb. 6, 1996), available at https://patents.google.com/patent/US5489674A/en (last accessed December 9, 2025).

[29] *Id.*

[30] Devendra Paudel et al., *Guar Gum-Induced Changes in Gut Microbiota Metabolic Activity and Intestinal Immune Response Augments Susceptibility to Experimental Colitis*, PMC9194036 (June 14, 2022), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9194036/ (last accessed December 9, 2025).

containing diet "exhibited increased susceptibility to both acute and chronic colitis" and "[r]elative to the control group, GuD-fed mice experienced greater occurrence of rectal bleeding, diarrhea, splenomegaly, and displayed higher levels of pro-inflammatory markers."[31] In human studies, even at doses found in food products, guar gum can cause "mild digestive symptoms like gas, diarrhea, bloating, and cramps."[32] Health practitioners specializing in gastrointestinal disorders specifically recommend that individuals with gut issues like SIBO or IBS avoid guar gum, as "even small amounts could cause unpleasant symptoms in those with sensitive digestive systems."[33]

> ### v.    *Carob bean Gum*

25.    Carob bean gum, also known as locust bean gum (LBG), is a synthetically processed food additive extracted from the seeds of the carob tree (Ceratonia siliqua L.), native to the Mediterranean region.[34]  The processing of carob bean gum involves multiple synthetic chemical treatments. The manufacturing process "first involves the removal of the outer husk from the seeds, which is achieved either by water-dehulling, acid-peeling, or high-temperature roasting."[35] Notably, in the acid-peeling process—which produces the whitest, highest-quality gum for food use—"carob seeds are treated with sulphuric acid at elevated temperatures to carbonise the seed coat," after which remaining fragments are removed by washing and brushing.[16] This acid treatment with sulfuric acid (a highly corrosive synthetic chemical) fundamentally alters the natural seed structure through chemical carbonization.

26.    To produce "clarified" locust bean gum for food applications requiring clear solutions, extensive synthetic chemical processing is necessary. "The clarifying process starts by

---

[31] *Id.*

[32] Healthline, *Is Guar Gum Healthy or Unhealthy? The Surprising Truth* (Sept. 26, 2019), available at https://www.healthline.com/nutrition/guar-gum (last accessed December 9, 2025).

[33] Chris Kresser, *Harmful or Harmless: Guar Gum, Locust Bean Gum, and More* (Aug. 24, 2023), available at https://chriskresser.com/harmful-or-harmless-guar-gum-locust-bean-gum-and-more/ (last accessed December 9, 2025).

[34] *Locust bean gum*, Wikipedia (Oct. 3, 2005), available at https://en.wikipedia.org/wiki/Locust_bean_gum (last accessed December 9, 2025).

[35] Ice Cream Science, *Locust Bean Gum in Ice Cream* (Nov. 17, 2023), available at https://www.icecreamscience.com/blog/locust-bean-gum-in-ice-cream (last accessed December 9, 2025).

dispersing the crude locust bean gum in hot water, soda, or acetic acid," followed by centrifugation or filtration to remove insoluble substances.[36] Then, "galactomannans are recovered by precipitation using solvents such as isopropanol, ethanol, or methanol, followed by filtering, drying, and milling to obtain fine particle size powder of purified carob bean gum."[37] These synthetic organic solvents—isopropanol, ethanol, and methanol—are chemical agents used to extract and purify the gum. Importantly, "[r]esidual amounts of ethanol or isopropanol, however, also act as impurities in locust bean gum powder,"[38] meaning synthetic solvent residues remain in the final food additive product.

27. Like guar gum, carob bean gum can be further chemically modified using synthetic reagents. One patent describes producing "phosphated locust bean gum" by treating the gum with phosphoric acid and alkali metal hydroxides at temperatures of 120°C to 180°C in the presence of synthetic organic liquids such as cyclohexanone.[39] Recent research describes additional chemical modifications including "carboxylation," "sulfation," and "grafting of a quaternary ammonium salt" using synthetic chemicals such as TEMPO, NaBr, GTMA, and HCl.[40] Such chemical modifications create synthetically-altered derivatives with functional properties that do not exist in nature.

28. Similar to guar gum, carob bean gum can cause digestive problems in sensitive individuals. Health practitioners note that locust bean gum "could cause unpleasant symptoms in those with sensitive digestive systems," particularly for individuals with SIBO or IBS.[41] Because carob bean gum is a soluble fiber that undergoes bacterial fermentation in the intestines, it "can produce gas and other byproducts that contribute to bloating, abdominal pain, inflammation, and discomfort" in susceptible individuals.

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] Chris Kresser, *Harmful or Harmless: Guar Gum, Locust Bean Gum, and More*, *supra*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.    Defendant's Products are Artificially Flavored

29.    The Food and Drug Administration ("FDA") defines an artificial flavor as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 CFR § 101.22(a)(1). As described above, the Products' use of citric acid, and ascorbic acid meets the definition of an artificial flavor because their function is to impart flavor in the Products, and they are not derived from a natural source like a spice, fruit, or vegetable. As a result of these artificial flavoring ingredients, Defendant's "No Artificial flavors" labeling statement is false and misleading.

30.    Citric acid and ascorbic acid function as flavoring ingredients in the Products regardless of whether Defendant intended them to do so. This is because citric acid and ascorbic acid impart a flavor that is reminiscent of fruit when used in the Products. Defendant's Products, which depict ripe, fresh fruit on the labels, utilize citric acid and ascorbic acid to impart the flavor that would otherwise be found in those fruits before they underwent the extensive processing to create the Products.

31.    The artificial citric acid, malic acid, and ascorbic acid in the Products are a "Flavoring agent" because they are added to the Products "to impart or help impart a taste or aroma in food." 21 C.F.R. § 170.3(0)(12). Under the FDA, if a food "contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name(s) of the characterizing flavor, in letters not less than one-half the height of the letters used in the name of the food and the name of the characterizing flavor shall be accompanied by the word(s) 'artificial' or 'artificially flavored', in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., 'artificial vanilla', 'artificially flavored strawberry', or 'grape artificially flavored'." 21 CFR § 101.22(i)(1)(iii).

32.    The characterizing flavor of the Products is fruits that contain acidic profiles. As such, citric acid, malic acid, and ascorbic acid are used in the Products to simulate, resemble, and reinforce those characterizing flavors. Accordingly, the Products must be labeled as "Artificially

Flavored." Defendant omits this legally required disclosure and instead falsely labels the Products as containing "No Artificial Flavors."

### D. The Products' Synthetic Ingredients Mislead Consumers

33.    Unfortunately for consumers like Plaintiff, despite the "Plant Based," "Made with Real Fruit," and "No Artificial Flavors" representations on packaging of the Products, the backs of the packaging, in small print, reveal the presence of artificial ingredients.

34.    By labeling the Products as being "Plant Based," "Made with Real Fruit," and "No Artificial Flavors," Defendant deliberately misled Plaintiff and other reasonable consumers into believing that the Products (a) were flavored from natural ingredients and (b) the other ingredients contained in the Products came from plants. As discussed above, however, both of those representations are false because the Products contain synthetic ingredients and flavoring agents.

### ii.    _Defendant's "No Artificial Flavors" claims mislead consumers_

35.    Consumers are accustomed to seeing front-of-package claims like 'Natural and Artificial Flavors' or 'Artificially Flavored' when artificial flavor agents are added to a product, and they expect disclosure in the absence of real source ingredients. Indeed, "[a]bout half (48%) of Americans say they seek out natural flavors at least some of the time[.]"[42]

36.    Numerous market research studies demonstrate that disclosure of artificial flavors is an industry standard that consumers rely on to make informed choices about product qualities and healthfulness. As summarized in a recent peer-reviewed article:

> Recent surveys show that 62% of consumers avoid artificial flavors. Indeed, retailers have successfully been able to charge more for products labeled as not containing any artificial flavors because of consumers' belief that these foods are healthier. Hoping to capitalize on this, major food producers have promised to eliminate artificial flavors from their foods, including General Mills, Kellogg's, and Nestlé. Natural flavors now rank as the fourth most common food ingredient in processed food products. Only salt, water, and sugar are more frequently included.[43]

---

I. [42] International Food Information Council, _Consumers Show Strong Interest in Knowing About Food Ingredients: "Clean" Is in, "Chemical-Sounding" Is Out_ (June 17, 2021), https://ific.org/media/strong-interest-in-knowing-about-food-ingredients/

[43] Benavides, Nena. _What's in a Flavor? A Proposal to Address Consumer Confusion Surrounding Natural Flavoring_. Food and Drug Law Journal, vol. 77, no. 4, 2022, pp. 377–98. JSTOR, https://www.jstor.org/stable/27211729. Accessed 5 Sept. 2025.

37.     Both the inclusion of the "No Artificial Flavors" representation as well as the failure to include a truthful 'artificially flavored' statement violate reasonable consumer expectations and deceive consumers who specifically seek to avoid artificial ingredients.

*iii.     The Context of the transaction reinforces Defendant's deceptive conduct*

38.     Consumers do not look at products in a vacuum. Instead, how they perceive a product's labels depends on the nature of the product that they are buying in comparison to other competing products. Here, Defendant markets its Products as a "Plant Based," "Made with Real Fruit," and "No Artificial Flavors" alternative to other popsicles. When a consumer sees that popsicles, like the Products, are labeled as "Plant Based," "Made with Real Fruit," and "No Artificial Flavors," they make the reasonable assumption that the Products will not contain the same type of synthetic ingredients found in ordinary popsicles.

**E.     The Products Added Sugar Consumption Increases Risk of Cardiovascular Heart Disease and Mortality**

39.     Cardiovascular diseases affect nearly half of American adults.[44]

40.     Cardiovascular Heart Disease (CHD) is the leading cause of death for men and women in the United States.[45] Approximately 20 million adults in the United States age twenty and older have coronary artery disease (CAD), which is the most common type of CHD.[46] In 2020, CAD killed more than 380,000 people.[47] Every year, more than 800,000 people in the United States have a heart attack.[48]

---

[44] American Heart Association News, "Cardiovascular diseases affect nearly half of American adults, statistics show" (Jan. 31, 2019), available at https://www.heart.org/en/news/2019/01/31/cardiovascular-diseases-affect-nearly-half-of-american-adults-statistics-show

[45] Centers for Disease Controls and Prevention, "Heart Disease Facts," https://www.cdc.gov/heartdisease/facts.htm (citing National Center for Health Statistics, Multiple Cause of Death 2018–2021 on CDC WONDER Database, https://wonder.cdc.gov/mcd.html)

[46] *Id.*

[47] *Id.*

[48] *Id.*

41.      Data obtained from National Health and Nutrition Examination surveys (NHANES) demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Thus, "[t]he risk of CVD mortality increased exponentially with increasing usual percentage of calories from added sugar[.]"[49]



Figure 1. Adjusted Hazard Ratio (HR) of the Usual Percentage of Calories From Added Sugar for Cardiovascular Disease Mortality Among US Adults 20 Years or Older: National Health and Nutrition Examination Survey Linked Mortality Files, 1988-2006

Histogram of the distribution of usual percentage of calories from added sugar in the population. Lines show the adjusted HRs from Cox models. Midvalue of quintile 1 (7.4%) was the reference standard. The model was adjusted for age, sex, race/ethnicity, educational attainment, smoking status, alcohol consumption, physical activity level, family history of cardiovascular disease, antihypertensive medication use, Healthy Eating Index score, body mass index, systolic blood pressure, total serum cholesterol, and total calories. Solid line indicates point estimates; dashed lines indicate 95% CIs.

42.      In a study of preschool children published in January 2020, researchers found that higher consumption of added sugar was significantly associated with elevated CMR (cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB [sugar-containing beverages] in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[50]

---

[49] Quanhe Yang et al., Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults, JAMA INTERN. MED., at E4-5 (Feb. 3, 2014).

[50] Karen M. Eny et al., Sugar-containing beverage consumption and cardiometabolic risk in preschool children, PREV. MED. REPORTS 17 (Jan. 14, 2020).

43.     In another prospective cohort study, consumption of added sugar was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[51]

44.     Added sugar consumption is also associated with several CHD risk factors, such as dyslipidemia,[52] obesity,[53] and increased blood pressure.[54]

**F.     Added Sugar Consumption Increases Risk of Type 2 Diabetes**

45.     Diabetes affects 37.3 million Americans (approximately 1 in 10), and 96 million American adults (more than 1 in 3) have prediabetes.[55] It can cause kidney failure, lower-limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[56]

46.     Globally, countries where sugar consumption is highest have the highest rates of type 2 diabetes, while those with the lowest consumption have the lowest rates.[57] An econometric analysis of repeated cross-sectional data published in 2013, for example, established a causal

---

[51] Lawrence de Koning et al., Sweetened beverage consumption, incident coronary heart disease, and biomarkers of risk in men, CIRCULATION, Vol. 125, pp. 1735-41 (2012).

[52] Sharon S. Elliott et al., Fructose, weight gain, and the insulin resistance syndrome, AM. J. CLIN. NUTR., Vol. 76, No. 5, pp. 911-22 (2002).

[53] Myles S. Faith et al., Fruit juice intake predicts increased adiposity gain in children from low-income families: weight status-by-environment interaction, PEDIATRICS, Vol. 118 (2006); Matthias B. Schulze et al., Sugar-sweetened beverages, weight gain, and incidence of type 2 diabetes in young and middle-aged women, JAMA, Vol. 292, No. 8, pp. 927-34 (2004); DS Ludwig et al., Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis, LANCET, Vol. 257, pp. 505-508 (2001); B A Dennison et al., Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity, PEDIATRICS, Vol. 99, pp. 15-22 (1997).

[54] Erin Hoare et al., Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk, NUTRIENTS, Vol. 9, No. 10 (2017).

[55] See https://www.cdc.gov/diabetes/library/spotlights/diabetes-facts-stats.html

[56] Javier Aranceta Bartrina & Carmen Pérez Rodrigo, Association between sucrose intake and cancer: a review of the evidence, NUTR. HOSP., Vol. 28 (Suppl. 4), 95-105 (2013); Custodia García-Jiménez et al., A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose, J. MOL. ENDOCRINOL., Vol. 52, No. 1 (2014); Gerard J. Linden et al., All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study, J. CLIN. PERIODONTAL., Vol. 39, No. 1, 940-46 (Oct. 2012).

[57] Praveen Weeratunga et al., Per capita sugar consumption and prevalence of diabetes mellitus--global and regional associations, BMC PUB. HEALTH, 2014 (Feb. 20, 2014).

---

relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically significant 11-fold difference.[58]

47.    An analysis of data for more than 50,000 women from the Nurses' Health Study,[59] during two 4-year periods (1991-1995 and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day—equivalent to 140-150 calories and 35-37.5 grams of added sugar—had an 83% greater relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month.[60]

48.    The link between sugar intake and diabetes still holds even after controlling for total calorie intake, body weight, alcohol consumption and exercise.[61]

**G.    Added Sugar Consumption Increases Risk of Metabolic Disease**

49.    Metabolic syndrome is a group of conditions that together raise the risk of type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease. Metabolic syndrome is defined as the presence of any three of the following:

- Large waist size (35" or more for women, 40" or more for men)
- High triglycerides (150mg/dL or higher, or use of cholesterol medication)

---

[58] Sanjay Basu et al., The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data, PLOS ONLINE, Vol. 8, Issue 2 (Feb. 27, 2013).

[59] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 female registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. See generally "The Nurses' Health Study," at http://www.channing.harvard.edu/nhs.

[60] Schulze et al., Sugar-sweetened beverages, weight gain, and incidence of type 2 diabetes in young and middle-aged women, JAMA, Vol. 292, No. 8, pp. 927-34 (2004).

[61] Sanjay Basu et al., The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data, PLOS ONLINE, Vol. 8, Issue 2 (Feb. 27, 2013).

- High total cholesterol, or HDL levels under 50mg/dL for women, and 40 mg for men
- High blood pressure (135/85 mm or higher)
- High blood sugar (100mg/dL or higher)

50.     More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[62]

51.     About 1 in 3 adults in the United States have metabolic syndrome, placing them at higher risk for chronic disease.[63]

52.     Defining "metabolic health" as having optimal levels of waist circumference (WC <102/88 cm for men/women), glucose (fasting glucose <100 mg/dL and hemoglobin A1c <5.7%), blood pressure (systolic <120 and diastolic <80 mmHg), triglycerides (<150 mg/dL), and high-density lipoprotein cholesterol (≥40/50 mg/dL for men/women), and not taking any related medication, data from the NHANES Survey 2009-2016 showed prevalence of "metabolic health" in American adults is alarmingly low, even in normal weight individuals.[64]

53.     Excess consumption of added sugar leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large doses of added sugar can overwhelm the liver, which metabolizes the fructose in the sugar. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream.

---

[62] Susan K. Fried & Salome P. Rao, Sugars, hypertriglyceridemia, and cardiovascular disease, AM. J. CLIN. NUTR., Vol. 78 (suppl.), 873S-80S, at 873S (2003).

[63] See https://www.nhlbi.nih.gov/health/metabolic-syndrome

[64] Joana Araújo et al., Prevalence of Optimal Metabolic Health in American Adults: National Health and Nutrition Examination Survey 2009-2016, METAB. SYNDR. RELAT. DISORD. (2019).

This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[65]

54.    In 2016, researchers conducted a study to determine whether the detrimental effects of dietary sugar were due to extremely high dosing, excess calories, or because of its effects on weight gain, rather than caused by sugar consumption directly.[66] In other words, the researchers dissociated the metabolic effects of dietary sugar from its calories and effects on weight gain.

55.    Because the researchers did not want to give subjects sugar to see if they got sick, they instead took sugar away from people who were already sick to see if they got well. But if subjects lost weight, critics would argue that the drop in calories or weight loss was the reason for the clinical improvement. Therefore, the researchers designed the study to be isocaloric, by giving back to subjects the same number of calories in starch that were taken away in sugar. The study involved 43 children, ages 8 to 19, each obese with at least one other co-morbidity demonstrating metabolic problems. All were high consumers of added sugar in their diets.[67]

56.    To perform the study, researchers assessed subjects' home diets by two questionnaires to determine how many calories, and how much fat, protein, and carbohydrate they were eating. Subjects were then tested at a hospital based on their home diets. Then, for the next 9 days, researchers catered the subjects' meals. The macronutrient percentages of fat, protein, and carbohydrate were not changed. Subjects were fed the same calories and percent of each macronutrient as their home diet; but within the carbohydrate fraction, researchers took the added sugar out, and substituted starch. For example, researchers took pastries out, and put bagels in; took yogurt out, and put baked potato chips in; took chicken teriyaki out, and put turkey hot dogs in (although subjects were still given whole fruit). Researchers reduced subjects' dietary sugar consumption from 28% to 10% of calories. Researchers also gave subjects a scale to take home,

---

[65] Lisa Te Morenga et al., Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies, BJM (2012).

[66] Robert H Lustig et al., Isocaloric fructose restriction and metabolic improvement in children with obesity and metabolic syndrome, OBESITY (SILVER SPRING), Vol. 24, No. 2, 453-60 (Feb. 2016).

[67] *Id.* at 453-54.

and each day they would weigh themselves. If they were losing weight, they were instructed to eat more. The goal was for subjects to remain weight-stable over the 10 days of study. On the final day, subjects came back to the hospital for testing on their experimental low-added sugar diet. The study team analyzed the pre- and post-data in a blinded fashion so as not to introduce bias.[68]

57.      Researchers analyzed three types of data. First, diastolic blood pressure decreased by 5 points. Second, baseline blood levels of analytes associated with metabolic disease, such as lipids, liver function tests, and lactate (a measure of metabolic performance) all improved significantly. Third, fasting glucose decreased by 5 points. Glucose tolerance improved markedly, and fasting insulin levels fell by 50%. Each of these results was highly-statistically-significant.[69]

58.      In sum, the study indicated that subjects improved their metabolic status in just 10 days, even while eating processed food, just by removing added sugar and substituting starch. The metabolic improvement, moreover, was unrelated to changes in weight or body fat.

**H.      Added Sugar Consumption Increases Risk of Liver Disease**

59.      Added sugar consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[70]

60.      Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[71]

---

[68] *Id.* at 454-55.

[69] *Id.* at 455-56.

[70] Geoffrey C. Farrell & Claire Z. Larter, Nonalcoholic fatty liver disease: from steatosis to cirrhosis, HEPATOLOGY, Vol. 433, No. 2 (Suppl. 1), S99-S112 (Feb. 2006); EE Powell et al., The natural history of nonalcoholic steatohepatitis: a follow-up study of forty-two patients for up to 21 years, HEPATOLOGY, Vol. 11, No. 1 (1990).

[71] Michael C. Charlton et al., Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States, GASTROENTEROLOGY, Vol. 141, No. 4, 1249-53 (Oct. 2011).

61.     Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing—for the first time—alcohol-related diseases in children. Conservative estimates are that 31% of American adults, and 13% of American children suffer from NAFLD.[72]

## I.     Authoritative Bodies Recommend, for Good Health, Excluding or Minimizing Added Sugar Consumption

62.     The 2020-2025 Dietary Guidelines for Americans ("DGA") states that a healthy dietary pattern limits added sugars to less than 10 percent of daily calories, adding that "[w]hen added sugars in foods and beverages exceed 10 percent of calories, a healthy dietary pattern within calories limits is very difficult to achieve."[73]

63.     The Scientific Report of the 2020 Dietary Guidelines Advisory Committee was even stricter than what the USDA and HHS ultimately adopted, "suggest[ing] that less than 6 percent of energy from added sugars is more consistent with a dietary pattern that is nutritionally adequate . . . than is a pattern with less than 10 percent energy from added sugars."[74]

64.     The FDA, which previously did not set limits on added sugar for foods labeled "healthy," recently proposed a limit of ≤5 percent of the daily value (and thus ≤2 ½ grams of added sugar for adults and children ages 4 and older) for making such claims.[75] The proposal passed in

---

[72] Sarah M. Lindbäck et al., Pediatric nonalcoholic fatty liver disease: a comprehensive review, ADV. PEDIATR., Vol. 57, No. 1, 85-140 (2010); Mariana Lazo & Jeanna M Clark, The epidemiology of nonalcoholic fatty liver disease: a global perspective, SEMIN. LIVER DIS., Vol. 28, No. 4, 339-50 (2008); Jeffrey B Schwimmer et al., Prevalence of Fatty Liver in Children and Adolescents, PEDIATRICS, Vol. 118, No. 4, 1388-93 (2006); Jeffrey D Browning et al., Prevalence of hepatic steatosis in an urban population in the United States: impact of ethnicity, HEPATOLOGY, Vol. 40, No. 6, 1387-95 (2004).

[73] See 2020-2025 DGA, at 41, available at https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf

[74] USDA, "Scientific Report of the 2020 Dietary Guidelines Advisory Committee" (2020), Part A, p. 11; see also Hope Warshaw & Steven V. Edelman, Practical Strategies to Help Reduce Added Sugars Consumption to Support Glycemic and Weight Management Goals, CLIN. DIABETES, Vol. 39,1 at 45-56 (Jan. 2021).

[75] Food Labeling: Nutrient Content Claims; Definition of Term "Healthy," 87 Fed. Reg. 59168, 59180 (Sept. 29, 2022) (to be codified at 10 C.F.R. § 101.65), available at https://www.govinfo.gov/content/pkg/FR-2022-09-29/pdf/2022-20975.pdf; see also Food Labeling: Nutrient Content Claims; Definition of Term "Healthy," Extension of Comment Period, 87 Fed. Reg. 73267 (Nov. 29, 2022).

---

fall 2023 and final action was scheduled for April 2024.[76] According to FDA, the prior definition permitted manufacturers to use the claim "healthy" on some foods that, based on the most up-to-date nutrition science and Federal dietary guidance, contain levels of nutrients that would not help consumers maintain healthy dietary practices (e.g., foods that may be high in added sugars). Thus, the "healthy" claim definition needed to be updated in order to ensure that products bearing the claim are the products that may help consumers maintain healthy dietary practices, consistent with current nutrition science and Federal dietary guidance.[77]

65.    FDA describes the update as "a step towards providing the public with information that can help them identify food choices that can help lead to reducing diet-related chronic diseases."[78]

66.    The World Health Organization (WHO) recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar.[79]

67.    The American Heart Association (AHA) recommends restricting added sugar to 5% of calories.[80]

68.    The Centers for Disease Control and Prevention (CDC) warns that "[t]oo much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease."[81]

69.    The National Kidney Foundation explains "added sugars don't add anything but empty calories, so . . . there's no extra nutritional benefit to consuming these sugars." Sugar "may be a key factor contributing to our national obesity epidemic" because "the average American

---

[76] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=0910-AI13

[77] See 87 Fed. Reg. at 59170, 59173.

[78] See https://www.fda.gov/consumers/consumer-updates/fresh-take-what-healthy-means-food-packages

[79] World Health Organization, "Healthy Diet," available at https://www.who.int/news-room/fact-sheets/detail/healthy-diet

[80] Rachel K. Johnson et al., Dietary sugars intake and cardiovascular health: a scientific statement from the American Heart Association, CIRCULATION, Vol. 120, 1011-20, at 1016-17 (2009).

[81] Centers for Disease Control and Prevention, "Know Your Limit for Added Sugars," https://www.cdc.gov/healthyweight/healthy_eating/sugar.html

consumes almost 152 pounds of sugar each year, which breaks down to almost 3 pounds . . . of sugar each week."[82]

70.    The American Diabetes Association says "[r]egardless of what cuisine you prefer, . . . all healthy eating plans . . . include . . . less added sugar."[83] It clarifies fruit can "help you satisfy your sweet tooth without the added sugar."[84]

71.    The National Cancer Institute, reflecting on the scientific evidence, explains "dietary patterns that included higher intake of added sugars were associated with an increased risk of cardiovascular disease, cancers, and other negative health outcomes."[85]

72.    The Harvard School of Public Health points out that "the Healthy Eating Plate does not include foods with added sugars."[86]

**J.    The Product's Added Sugar is Harmful to Consumers and Misleading**

73.    The Products contain 24 grams of added sugar per serving, contributing approximately 48% of their calories, more than five times the 2020-2025 DGA recommendation for a healthy dietary pattern.

74.    Because the scientific evidence establishes that consuming such high amounts of added sugar is likely to increase risk of cardiovascular disease, type 2 diabetes, metabolic disease, and liver disease—and because the Products contain such high amounts of added sugar—Defendant's health and wellness Representations concerning the Products are false and misleading.

75.    Defendant is under a duty to disclose the harms associated with consuming the amount of added sugar in the Products to consumers because it is revealing some information about

---

[82] National Kidney Foundation, "5 Sneaky Sources of Sugar," Kidney.org, https://www.kidney.org/atoz/content/5_Sneaky_Sources_of_Sugar (last accessed Mar. 7, 2024).

[83] American Diabetes Association, "Tips for Eating Well," Diabetes.org, https://diabetes.org/food-nutrition/eating-healthy (last accessed May 16, 2024).

[84] *Id.*

[85] National Cancer Institute, "Updated Nutrition Facts Label Reflects Science on Diet and Health, Including Cancer," cancer.gov (May 19, 2020), https://www.cancer.gov/news-events/cancer-currents-blog/2020/nutrition-facts-label-updated-fda-nci.

[86] Harvard T.H. Chan School of Public Health, "Added Sugar," The Nutrition Source, available at https://www.hsph.harvard.edu/nutritionsource/carbohydrates/added-sugar-in-the-diet

the Products—enough to suggest they are healthy—without revealing material information regarding the harmful effects of added sugar described herein.

76.    Defendant is further under a duty to disclose this information because its deceptive omissions concern human health, specifically the detrimental health effects of consuming the Products.

77.    Defendant is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the added sugars in the Products, as it is a large, sophisticated company that holds itself out as have expert knowledge regarding the health impact of consuming the Products.

78.    Finally, Defendant is under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiff and the Class concerning the detrimental effects of regularly consuming the Products.

**K.    The Product's Nutritional Profile Differs Significantly from Real Fruits.**

79.    Defendant prominently advertises the Products as "Fruit Bars" that are "made with real fruit" with large, vibrant images of fruits on the front and sides of the packaging. These representations, together with statements such as "Made with Real Fruit" and "Plant Based," communicate that the Products are essentially frozen fruit on a stick or the nutritional equivalent of eating real fruit.

80.    Despite this, the Products are formulated frozen desserts, not simply frozen fruit. For instance, a serving size of the Strawberry Fruit Bar contains approximately 28 grams of total sugar, of which 24 grams are added sugars, and provides 2 grams of dietary fiber. By contrast, a comparable serving of fresh strawberries (about two cups) naturally contains roughly 14 grams of sugar, 6 grams of fiber, and no added sugar at all. Thus, on a calorie-for-calorie basis, the Products contain significantly more sugar and substantially less fiber than real strawberries.

81.    Unlike whole strawberries, which contain only the fruit's intrinsic sugars and water, the Products derive a substantial portion of their sweetness from refined cane sugar added during manufacturing. Nothing on the front of the package discloses that the Products contain 24 grams of added sugar, or that the majority of the sugar is not the natural sugar found in whole fruit.

82.     In addition, the Products are fortified with Vitamin C through added ascorbic acid, and the packaging highlights that each bar is a "Good Source of Vitamin C." Fresh strawberries naturally provide nearly a full day's worth of Vitamin C per cup, without fortification. By contrast, the Products provide only about 30% of the Daily Value of Vitamin C, largely from the added ascorbic acid rather than from the fruit itself.

83.     The Products further differ from real strawberries in that they contain multiple texture-modifying gums, including guar gum and carob bean gum, citric, ascorbic, and malic acids, as well as "natural flavor," "beet juice," "turmeric oleoresin color," and "lemon juice." Strawberries, of course, do not contain any of those ingredients. The need to supplement the Products with these ingredients underscores that the Products are engineered, processed desserts, not simple frozen fruit.

84.     In short, the Products are nutritionally and materially different from real fruit. Real fruits provide naturally occurring vitamins (especially Vitamin C), water, and fiber in a low-calorie whole food, without added sugar, gums, artificial processing aids, or color and flavor additives. The Products, by contrast, are high-sugar frozen confections with negligible fiber, modest vitamin content achieved through fortification, and multiple non-fruit ingredients that alter texture, flavor, and appearance.

**L.     Defendant's Representations Are False and Misleading**

85.     As detailed above, all of Defendant's Representations are false and misleading. Specifically, Defendant's Representations mislead consumers into believing that the Products are (1) healthy; (2) comprised exclusively, or at least predominately, of the depicted fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without artificial flavors.

86.     Despite those representations, however, the Products are (1) unhealthy due to the high amount of added sugar; (2) comprised of ingredients not found in real fruit; (3) nutritionally distinct from real fruits; (4) contain synthetic ingredients; and (5) contain artificial flavors.

87.     Moreover, the disclosure of the gram amount of added sugar in the Products' Nutrition Facts Panels is insufficient to Defendant's misleading health and wellness claims and omissions. Not only are reasonable consumers not expected to inspect that information, but numerous studies demonstrate most consumers cannot make accurate assessments of a food's healthfulness based on the Nutrition Facts Panel, even when they do.

88.     Research shows most consumers do not actually review the sugar content of products, and even those who do are often unable to accurately determine a product's healthfulness. The University of Minnesota's Epidemiology Clinical Research Center simulated a grocery shopping exercise on a computer equipped with an eye-tracking camera and found that, even for the relatively small subset of consumers that claim to "almost always" look at a product's sugar content (24%), only about 1% actually look beyond the calorie count to other components of the Nutrition Facts panel, such as sugar.[87] Data from the survey suggests the average consumer reads only the top five lines on a Nutrition Facts label (serving size, calories, total fat, saturated fat, trans fat). Total and added sugar—listed eleventh and twelfth on the Product labels—follows total fat, saturated fat, cholesterol, sodium, total carbohydrate, and dietary fiber, among other things.

89.     A survey of more than one hundred college students examined how those with differing levels of nutrition knowledge interpreted "intrinsic" cues (ingredient list) and "extrinsic" cues, such as an "all natural" labeling claim.[88] The survey found that while those who had completed an upper-division nutrition course "used central route processing to scrutinize intrinsic cues and make judgments about food products," those who had not completed an upper-division nutrition course "did the opposite," relying on extrinsic cues.[89] The average consumer will thus more likely rely on labeling claims than the ingredient list or Nutrition Facts Box, to make a judgment about whether a food is healthy.

---

[87] Dan J. Graham & Robert W. Jeffery, Location, location, location: eye-tracking evidence that consumers preferentially view prominently positioned nutrition information, J. AM. DIET. ASSOC. (2011).

[88] Amber Walters et al., The effect of food label cues on perceptions of quality and purchase intentions among high-involvement consumers with varying levels of nutrition knowledge, J. NUTR. EDUC. BEHAV. 44(4): 350-54 (2012).

[89] *Id.*

90.     Moreover, "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use."[90] "Using NFP labels requires not only being able to read and perform arithmetic but also—just as importantly—the ability to reason with words and numbers. According[ly], a substantial proportion of consumers clearly struggle to effectively use the information contained in a nutrition label."[91]

91.     One survey found "[s]ubjects were not very good at using the [nutrition] label to make mathematical calculations, evaluate false claims, or draw dietary implications about a product," and "[r]esearch has consistently found that consumers have difficulty using label information if the task requires math."[92] Accordingly, the authors concluded the nutrition label is "an inadequate tool for helping people to plan diets" and "unlikely to contribute by itself to a better or more critical understanding of nutrition principles."[93] In sum, the "mathematical skills of the American population present a significant barrier to following dietary recommendations based on quantitative tasks."[94]

92.     Consumers' inability to effectively use the nutrition label is particularly problematic in light of their tendency to rely heavily on symbolic cues of healthfulness. For example, in a survey of 164 consumers, participants were asked to evaluate the healthiness of two breakfast cereals based on the information provided in a nutrition table. For one group, "the label 'fruit sugar' was used; for the other, the label 'sugar' was used. Results suggest[ed] that the phrase 'fruit sugar' listed as an ingredient of the breakfast cereal resulted in a more positive perception of the healthiness of the cereal compared with the ingredient labeled 'sugar.'"[95]

---

[90] Alexander Persoskie et al., US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy, PREV. CHRONIC DIS. 14;170066 (2017).

[91] Id.

[92] Alan S. Levy & Sara B. Fein, Consumers' Ability to Perform Tasks Using Nutrition Labels, J. NUTR. EDUC. & BEHAV. (1998).

[93] Id.

[94] Id.

[95] Bernadette Sutterlin & Michael Siegrist, Simply adding the word 'fruit' makes sugar healthier: The misleading effect of symbolic information on the perceived healthiness of food, APPETITE (Dec. 2015).

93.    A recent survey of 2,000 U.S. participants demonstrated that "[t]he American population fails very clearly to identify healthy products . . . ."[96] In the survey, each participant was shown a collection of cereal bars and asked to rank them from healthiest to least healthy. The products' health "rankings were based off of the A through E Nutri-score used to grade some food products in the UK," and ultimately, "only 9% of participants were able to correctly identify which product was the healthiest[.]"[97]

94.    "Even more worrying, 13 percent identified the least nutritious food option as the healthiest—more than the amount who properly identified the healthiest."[98] This was despite that "60% actively are seeking food and beverage products to support their overall health," demonstrating "widespread confusion when it comes to determining what is and isn't healthy."[99]

95.    Thus, although "Americans are often advised to eat healthier, more nutritious foods in an effort to stifle the diabetes and the obesity epidemic striking the nation[,] [r]esearchers find that many cannot identify healthy foods in the grocery store aisle . . . ."[100] Instead, Americans were found to misidentify claims such as "whole grain" or "naturally flavored" as "markers that a food [is] healthy." These claims often "mislead people on what products are actually healthy for them," and "Americans' failure to identify healthy products is likely playing a role in the nation's budding obesity and diabetes epidemics."[101]

96.    The survey also looked at the impact of "call[ing] out the amount of different nutrients in their products . . . on the front of their packages" while not "also call[ing] out the amount of potentially less desirable ingredients, like sugars, sweeteners, sodium or saturated

---

[96] Mansur Shaheen, "Only 9% of Americans can properly read a nutrition label with many falling for misleading labels like 'whole grain' or 'fat free' on the front of packaging," Daily Mail (Apr. 15, 2022).

[97] *Id.*

[98] *Id.*

[99] Sam Danley, "Study finds few consumers understand healthy food labels," Supermarket Perimeter (Mar. 16, 2022).

[100] Shaheen, supra.

[101] *Id.*

fats."[102]It found "this kind of potentially selective attribute labeling . . . had the biggest sway in leading consumers to make incorrect health-related choices."[103]

97.    Additionally, reading the Products' nutrition information is unlikely to sufficiently correct consumers' understanding of the healthfulness of the Products because the vast majority of consumers do not have the nutrition knowledge to accurately interpret the nutrition facts. In other words, "frequent use of nutrition labels does not promote understanding of [nutrient] levels."[104]

98.    A 2017 Shopper Trends Study by Label Insights found that "67% of consumers say it is challenging to determine whether a food product meets their [dietary] needs simply by looking at the package label[.]"[105]

99.    A 2021 survey found that "[c]onsumers perceive health differences even when two products have the same Nutrition Facts label" if there are packaging claims suggesting healthfulness.[106]

100.    In one survey, more than 3,000 U.S. adults viewed an ice cream nutrition label and then answered four questions that tested their ability to apply, understand, and interpret the nutrition information. Approximately 24% could not determine the calorie content of the full ice-cream container; 21% could not estimate the number of servings equal to 60g of carbohydrates; 42% could not estimate the effect on daily calorie intake of foregoing 1 serving; and 41% could not calculate the percentage daily value of calories in a single serving.[107] Only 53.9% of respondents who had earned a 4-year college degree could correctly answer all four nutrition label questions.[108]

---

[102] Megan Poinski, "Fewer than 1 in 10 consumers can make healthy choices from front-of-pack labeling, study finds," Food Dive (Mar. 15, 2022).

[103] *Id.*

[104] Lisa M. Soederberg Miller & Diana L. Cassady, The effects of nutrition knowledge on food label use: A review of the literature, APPETITE (2015).

[105] "Study Shows Labeling Often Confuses Consumers," Packaging Strategies (Mar. 30, 2017).

[106] International Food Information Council, "2021 Food & Health Survey," at 31 (2021).

[107] Persoskie et al., US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy, PREV. CHRONIC DIS. 14;170066 (2017).

[108] *Id.*

101.    Recently, the FDA recognized that "many consumers would like to know how to use th[e] [Nutrition Facts] information more effectively and easily," and so published a guide on "How to Understand and Use the Nutrition Facts Label."[109] It took the FDA nearly twelve pages to explain how to "make it easier for you to use the Nutrition Facts labels to make quick, informed food decisions to help you choose a healthy diet."

102.    The problem is so severe that the FDA created an entire "education campaign" designed to "help consumers, health care professionals, and educators learn how to use [the Nutrition Facts Label] as a tool for maintaining healthy dietary practice," recognizing the current widespread confusion, even among "health care professionals," in how to properly use the Nutrition Facts to make healthy choices.[110]

**M.    Defendant's Conduct Violates Federal Food Labeling Laws**

103.    The Products and their challenged labeling statements violate California Health and Safety Code §§ 109875, et. seq. (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See, e.g., id.* § 110100*; id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

104.    First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular."

105.    Second, despite making the challenged claims, Defendant "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products.

106.    Third, Defendant failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in

---

[109] FDA, "How to Understand and Use the Nutrition Facts Label"

[110] FDA, "The New Nutrition Facts Label—What's in it for you?"

1    such labeling," and "such conditions of use as are customary or usual," in violation of 21 C.F.R. §

2    1.21(a)(2)(ii). Namely, Defendant failed to disclose the increased risk of serious chronic disease

3    and death that is likely to result from consumption of the Products in the customary and prescribed

4    manner.

5    **N.    Defendant's Conduct Violates California's Food Labeling Laws**

6    107.    Defendant's marketing, advertising, and sale of the Products violates the

7    misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*),

8    including but not limited to:

9    a. Section 110660 (a food is misbranded if its label is false or misleading in any particular);

10    b. Section 110665 (a food is misbranded if its labeling does not conform with the

11    requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

12    b. Section 110705 (a food is misbranded if words, statements and other information

13    required by the Sherman Law to appear on food labeling are either missing or not sufficiently

14    conspicuous);

15    c. Section 110760 (making it unlawful for any person to manufacture, sell, deliver, hold, or

16    offer for sale any food that is misbranded);

17    d. Section 110765 (making it unlawful for any person to misbrand any food); and

18    e. Section 110770 (making it unlawful for any person to receive in commerce any food that

19    is misbranded or to deliver or proffer for delivery any such food).

20    108.    Defendant's marketing, advertising, and sale of the Products also violates the false

21    advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*),

22    including, but not limited to:

23    a. Section 110390 (making it unlawful to disseminate false or misleading food

24    advertisements that include statements on products and product packaging or labeling or

25    any other medium used to directly or indirectly induce the purchase of a food product;);

26    b. Section 110395 (making it unlawful to manufacture, sell, deliver, hold or offer to sell any

27    falsely or misleadingly advertised food); and

28

c. Sections 110398 and 110400 (making it unlawful to advertise misbranded food or to

deliver or proffer for delivery any food that has been falsely or misleadingly advertised).

## CLASS ALLEGATIONS

109.    Plaintiff brings this action on behalf of herself and all others similarly situated

pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) defined as

("collectively, the "Classes"):

> **Nationwide Class:** All persons in the United States who, during the maximum period of time permitted by law, purchased Defendant's Products primarily for consumption (the "Class").

> **California Subclass:** All persons in California who, during the maximum period of time permitted by the law, purchased Defendant's Products primarily for consumption (the "California Subclass")

110.    The Classes do not include (1) Defendant, its officers, and/or directors; (2) the

Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and

family; and (4) Plaintiff's counsel and Defendant's counsel.

111.    Plaintiff reserves the right to amend the above class definitions and add additional

classes and subclasses as appropriate based on investigation, discovery, and the specific theories of

liability.

112.    ***Community of Interest:*** There is a well-defined community of interest among

members of the Classes, and the disposition of the claims of these members of the Classes in a

single action will provide substantial benefits to all parties and to the Court.

113.    ***Numerosity:*** While the exact number of members of the Classes is unknown to

Plaintiff at this time, and can only be determined by appropriate discovery, upon information and

belief, members of the Classes number in the millions.  Members of the Classes may be notified of

the pendency of this action by mail and/or publication through the distribution records of

Defendant and third-party retailers and vendors.

114.    ***Existence and Predominance of Common Questions of Law and Fact:*** Common

questions of law and fact exist as to all members of the Classes and predominate over any

questions affecting only individuals of the Classes.  These common legal and factual questions

include, but are not limited to:

> (a)  Whether the Products' Representations concerning the Products ingredients are
>
> false and misleading;
>
> (b)  Whether Defendant's representations and warranties were material;
>
> (c)  Whether Defendant was unjustly enriched as a result of its unlawful conduct
>
> alleged in this Complaint.

115.  With respect to the California Subclass, additional questions of law and fact

common to the members include whether Defendant violated California's Consumers Legal

Remedies Act, ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., California's False Advertising Law

("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, and California's Unfair Competition Law

("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

116.  **Typicality:**  The claims of the named Plaintiff are typical of the claims of other

members of the Classes in that the named Plaintiff was exposed to Defendant's false and

misleading advertising about the Product's naturalness, purchased the deceptive Products in

reliance on those representations and warranties, and suffered a loss as a result of those purchases.

117.  **Adequacy:**  Plaintiff will fairly and adequately represent and protect the interests of

the Classes as required by Fed. R. Civ. P. 23(a)(4).  Plaintiff is an adequate representative of the

Classes because she has no interests adverse to the interest of the members of the Classes.  Plaintiff

is committed to the vigorous prosecution of this action, and, to that end, has retained skilled and

experienced counsel.

118.  **Superiority:**  A class action is superior to all other available methods for the fair and

efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure

23(b)(3) because the expense and burden of individual litigation makes it economically unfeasible

for members of the Classes to seek redress their claims other than through the procedure of a class

action.  In addition, even if Class Members could afford individual litigation, the court system

could not.  It would be unduly burdensome to the courts in which individual litigation of numerous

cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presented fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.  Class-wide relief is essential to compel compliance with California's consumer protection laws.  If separate actions were brought by individual members of the Classes, Defendant could be subject to inconsistent obligations.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumer's Legal Remedies Act ("CLRA"),
Cal. Civ. Code § 1750, *et seq*.
(On Behalf of Plaintiff and the California Subclass)**

119.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

120.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

121.    Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

122.    Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

123.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers by advertising that the Products are (1) healthy; (2) comprised exclusively, or at least predominately, of the depicted fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without artificial flavors.

124.    Despite those representations, however, the Products are (1) unhealthy due to the high amount of added sugar; (2) comprised of ingredients not found in real fruit; (3) nutritionally distinct from real fruits; (4) contain synthetic ingredients; and (5) contain artificial flavors.

125.    Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

126.    On December 9, 2025, Plaintiff sent a pre-suit notice letter pursuant to CLRA § 1782.  The letter was sent certified mail, return receipt requested, and provided notice of Defendant's violation of the CLRA and demands that Defendant correct the unlawful, unfair, false and/or deceptive practices alleged herein. If Defendant fails to remedy the issues raised in the letter, Plaintiff and the California Subclass will amend the complaint to add actual and punitive damages, restitution, reasonable costs and attorneys' fee, and to enjoin the unlawful acts and practices described herein pursuant to Cal. Civ. Code § 1780

**COUNT II**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On behalf of the Plaintiff and California Subclass)**

127.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

128.    Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

129.    Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§17200-17210, by engaging in unfair, fraudulent, and unlawful business practices.

130.    Plaintiff has standing to pursue this claim because she suffered an injury-in-fact and lost money or property as a result of Defendant's unlawful, unfair, and fraudulent conduct. Specifically, Plaintiff purchased the Products for her own personal use.  In so doing, Plaintiff relied upon Defendant's false Representations that the Products are (1) healthy; (2) comprised exclusively, or at least predominately, of the depicted fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without artificial flavors.

131.    Despite those representations, however, the Products are (1) unhealthy due to the high amount of added sugar; (2) comprised of ingredients not found in real fruit; (3) nutritionally distinct from real fruits; (4) contain synthetic ingredients; and (5) contain artificial flavors.

132.    Plaintiff spent money in the transaction that she otherwise would not have spent had she known the truth about Defendant's advertising claims.

133.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200. A business act or practice is "unlawful" if it violates any established state or federal law. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of herself or others similarly situated who are affected by the unlawful and/or unfair business practice or act.

134.    Defendant's acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, *et seq.*

135.    Defendant violated the UCL's proscription against engaging in **Unlawful Business Practices** through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*; CLRA, Cal. Civ. Code § 1770*, et seq.*; and the Sherman Law, including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.*

136.    Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, *et seq.* in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and

unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.  There is no utility to misrepresenting the true composition of the Products to the detriment of consumers. Furthermore, Defendant's false and misleading representations are detrimental to other energy drinks that either do not make similar claims, or if they do, they do not contradict them by adding highly processed and synthetic ingredients. As such, Defendant's misrepresentations and omissions hurt both consumers and the energy drink market as a whole.

137.    Plaintiff and the Classes suffered substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omissions about the inclusion of synthetic ingredients.

138.    The gravity of the consequences of Defendant's conduct as described above outweigh any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the Classes.

139.    Plaintiff and the Classes could not have reasonably avoided their injury or known that the Product's prominent, front-label marketing was, in fact, inaccurate and contradicted by Defendant's back-label, fine-print ingredient list. Furthermore, consumers do not possess the specialized knowledge to discern if the ingredients listed on the back panel are natural or synthetic. As such, they could not have reasonably avoided the injury they suffered.

140.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass Members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

141.    Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and the California Subclass Members are inadequate because they are not equally prompt, certain, and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and

restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the UCL entail fewer elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

142.    Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Products are determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.

**COUNT III**
**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500**
**(On Behalf of the California Subclass)**

143.    Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

144.    Plaintiff brings this claim on behalf of herself and the California Subclass against Defendant.

145.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive members of the California Subclass and the public.  As described throughout this Complaint, Defendant misrepresents that the Products are (1) healthy; (2) comprised exclusively, or at least predominately, of the depicted fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without artificial flavors.

146.    Despite those representations, however, the Products are (1) unhealthy due to the high amount of added sugar; (2) comprised of ingredients not found in real fruit; (3) nutritionally distinct from real fruits; (4) contain synthetic ingredients; and (5) contain artificial flavors.

147.    By its actions, Defendant has disseminated uniform advertising regarding the Products across California and the U.S.  The advertising was, by its very nature, unfair, deceptive,

1    untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such

2    advertisements were intended to, and likely did, deceive the consuming public.

3         148.    The above-described false, misleading, and deceptive advertising Defendant

4    disseminated continues to have a likelihood to deceive in that Defendant affirmatively represented

5    that the Products (1) healthy; (2) comprised exclusively, or at least predominately, of the depicted

6    fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without

7    artificial flavors.

8         149.    In making and disseminating these statements, Defendant knew, or should have

9    known, that its advertising was untrue and misleading in violation of California law.  Plaintiff and

10   the members of the California Subclass based their purchasing decisions on Defendant's materially

11   false and misleading representations and warranties about the composition of its Products.  Plaintiff

12   and the California Subclass were injured in fact and lost money and property as a result, in an

13   amount to be proven at trial.

14        150.    The misrepresentations by Defendant of the material facts described and detailed

15   above herein constitute false and misleading advertising and, therefore, constitute a violation of

16   Cal. Bus. & Prof. Code § 17500, *et seq*.

17        151.    Plaintiff and the California Subclass Members seek restitution, attorneys' fees, and

18   all other relief that the Court deems proper.

19        152.    Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here.

20   Legal remedies available to Plaintiff and the California Subclass Members are inadequate because

21   they are not equally prompt and certain, and in other ways as efficient as equitable relief. Damages

22   are not equally certain as restitution because the standard that governs restitution is different than

23   the standard that governs damages. Hence, the Court may award restitution even if it determines

24   that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and

25   restitution are not the same amount. Unlike damages, restitution is not limited to the amount of

26   money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including

27   restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original

28   funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for

damages are not equally certain as restitution because claims under the FAL entail fewer elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

153.    Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Product are determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.

**COUNT IV**
**Breach of Express Warranty**
**(On Behalf of a Nationwide Class)**

154.    Plaintiff hereby incorporates the foregoing paragraphs as if fully stated herein.

155.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant.

156.    Plaintiff brings this claim under the laws of the State of California.

157.    Plaintiff and the Nationwide Class Members formed a contract with Defendant at the time Plaintiff and the Nationwide Class Members purchased the Products.

158.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging that they are (1) healthy; (2) comprised exclusively, or at least predominately, of the depicted fruit; (3) nutritionally equivalent to real fruit; (4) without synthetic ingredients; and (5) without artificial flavors.

159.    This labeling and advertising constitute express warranties and became part of the basis of the bargain and part of the standardized contract between Plaintiff and the Nationwide Class and Defendant.

160.    Defendant breached its express warranties about the Products by including artificial flavors and synthetic additives, thereby rendering the prominent representations and warranties false.  Simply, the Products do not conform to Defendant's representations and warranties.

161.    Plaintiff and the Nationwide Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

162.   Plaintiff and the members of the Nationwide Class would not have purchased the Products had they known the true nature of the Products.

163.   As a result of Defendant's breach of express warranty, Plaintiff and each member of the Nationwide Class suffered financial damage and injury as a result and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

a)   For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's Counsel as Class Counsel;

b)   For an order declaring that Defendant's conduct violates each of the statutes referenced herein;

c)   For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e)   For prejudgment interest on all amounts awarded;

f)   For an order of restitution and all other forms of equitable monetary relief;

g)   For injunctive relief as pleaded or as the Court may deem proper;

h)   For an order awarding Plaintiff and the Classes' their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 9, 2025                    Respectfully submitted,

**GUCOVSCHI LAW FIRM, PLLC.**

By:   */s/ Adrian Gucovschi*
Adrian Gucovschi (State Bar No. 360988)
140 Broadway, Fl. 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gucovschilaw.com

*Attorneys for Plaintiff*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

I, Adrian Gucovschi, declare as follows:

3

1.    I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court. I am a partner at Gucovschi Law Firm, PLLC, counsel of record for Plaintiff

5

Rebecca Gomez in this action. I have personal knowledge of the facts set forth in this declaration

6

and, if called as a witness, I could and would competently testify thereto under oath.

7

2.    The Complaint filed in this action is filed in the proper place for trial under Civil

8

Code Section 1780(d) in that a substantial portion of the transaction alleged in the Complaint

9

occurred in Humboldt County, California. Plaintiff Recca Gomez alleges she purchased the

10

Products in this County.

11

I declare under the penalty of perjury under the laws of the State of California and the United

12

States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida,

13

this 9th day of December, 2025.

14

15

                         */s/ Adrian Gucovschi*
                          Adrian Gucovschi

16

17

18

19

20

21

22

23

24

25

26

27

28